

**SO ORDERED.**

**SIGNED this 30 day of October, 2006.**

_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

In re: )
 )
JAMES DALE SCHOONOVER and )
RUTH ANN SCHOONOVER, ) Case No. 05-43662-7
 )
Debtors. )
_____)

**MEMORANDUM OPINION AND ORDER GRANTING
TRUSTEE'S MOTION FOR TURNOVER**

This matter is before the Court on the Trustee's Motion for Turnover.[1] The only remaining issue is whether the Trustee can compel turnover of funds in the amount of the balances in Debtors' bank accounts on the date they filed their bankruptcy petition. This Court has jurisdiction over this contested matter,[2] and it is a core proceeding.[3]

_____

[1] Doc. 30. The Trustee originally sought both the turnover of the estate's pre-petition portion of Debtors' 2005 federal and state income tax refunds as well as the turnover of money equivalent to the amount held in Debtors' bank accounts on the date they filed their bankruptcy petition. The issue concerning the tax refunds has been resolved by the entry of an agreed Order Partially Granting Trustee's Motion for Turnover. Doc. 40.

[2] 28 U.S.C. §§ 157 and 1334(b).

[3] 28 U.S.C. § 157(b)(2)(E).

## I. FINDINGS OF FACT

The parties have submitted an Agreed Statement of Material Facts as to Trustee's Motion to Turn Over Assets.[4] Based upon that stipulation, the Court makes the following findings of fact. Debtors' Schedule B, filed with their bankruptcy petition in this case on October 7, 2005, indicates that Debtor, Ruth Ann Schoonover, is the owner of an account at Bank of America, and that both Debtors own a joint account at Commerce Bank. Debtors' Schedule B discloses that the Commerce Bank account balance on the date of filing was $75.00, and the Bank of America account balance was $50.00. Schedule B reveals neither the actual address where either account is maintained, nor the bank account numbers, listing only "Topeka" as the location.

A review of the bank statements for the relevant time period shows that the actual bank balances on the date of filing were, instead, $2,615.51 at Commerce and $182.28 at Bank of America. The difference between the amount Debtors revealed in their bankruptcy schedules for the Commerce account, compared to the amount actually contained in the account on the date of filing, was attributable to checks written by Debtors pre-petition, but which were honored by the respective banks post-petition.[5] Debtors claim that prior to filing, they had written and delivered three checks on the Commerce account, as follows: 1) to Countrywide Home Loans in the amount of $877.69 for their first mortgage payment; 2) to Net Bank in the amount of $195.00 for their second mortgage payment; and 3) to Green & Finch, Chartered, Attorneys, in the amount of $1309.00, representing the agreed attorney fees and filing fees associated with filing this bankruptcy.

---

[4]Doc. 39.

[5]This is a true statement as far as the Commerce account is concerned. There has been no explanation provided for misstating the Bank of America balance; there is no stipulation that checks had been written, but not yet cleared, on that account.

The checks written to Green & Finch and to Countrywide cleared Debtors' account on October 12, 2005; the check written to Net Bank cleared the account on October 11, 2005. The Trustee seeks an order requiring Debtors to return to the bankruptcy estate the amounts in their bank accounts on the date of filing, not the amount they show in their check register, for a total $2,797.79.

## II. CONCLUSIONS OF LAW

As the movant, the Trustee carries the burden of proof on his Motion for Turnover.[6] The Trustee must show that Debtors had "possession, custody, or control" of the bank accounts on the date that they filed their petition.[7]

Debtors tacitly admit that the money held in their bank accounts on the date they filed their bankruptcy petition is property of the estate by relying on *In re Figueira*[8] and *In re Taylor*,[9] both of which ultimately held that the debtor did not have to repay the money to the estate, but which also agreed that the actual bank balances in question were property of the estate. Debtors also do not, and really cannot, dispute, that they had management of, or control over, the funds deposited in the accounts. Thus, the only real decision for this Court is to determine who should be responsible for replenishing the estate of that property, if anyone.

---

[6] *In re Himes*, 179 B.R. 279 (Bankr. E.D. Okla. 1995) (burden of proof in turnover proceeding is on trustee); *In re Muniz*, 320 B.R. 697, 699-700 (Bankr. D. Colo. 2005); *Blinder, Robinson & Co., Inc.*, 140 B.R. 790, 793 (D. Colo. 1992). *See also In re Sawyer*, 324 B.R.115, 118 (Bankr. D. Ariz. 2005).

[7] *See* 11 U.S.C. § 542(a). *See also In re Sawyer*, 324 B.R. at 122. This case was filed before October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 become effective. All statutory references to the Bankruptcy Code are to 11 U.S.C.A. §§ 101 - 1330 (2004), and all references to the Federal Rules of Bankruptcy Procedure are to Fed. R. Bankr. P. (2004), unless otherwise specified.

[8] 163 B.R. 192, 194 (Bankr. D. Kan. 1993) (holding that "[u]nquestionably, the debtors' bank account and any balance in it became property of the estate upon the filing of their petition. *See* 11 U.S.C.A. § 541(a)(1)").

[9] 332 B.R. 609 (Bankr. W.D. Mo. 2005).

3

This Court has located eight decisions that address this issue. As a threshold matter, all eight decisions agree that the money is property of the estate.[10] Four find the debtor responsible for returning the estate's property,[11] three require the trustee to attempt to recover the money directly from the payees,[12] and the last decision finds that although the money actually in the bank account on the date of filing was property of the estate, the debtor did not have to repay the money because the Trustee had erroneously sought turnover only under § 550.[13]

One of the decisions holding that debtors must return the money to the estate, *In re Spencer,*[14] was recently issued from another division of this Court by Chief Judge Nugent. *Spencer* rejected the notion that a debtor's only obligation is to provide information about the whereabouts

---

[10] The Court incorporates Chief Judge Nugent's succinct explanation, in *In re Spencer*, Case No. 05-18421, (Bankr. D. Kan. June 27, 2006), of the relevant banking law and case law that unequivocally lead to this conclusion, and highlights the specific Comment to Kan. Stat. Ann. 84-3-408 (1996) that "the drawer's [here—the Schoonovers] trustee in bankruptcy may claim the account as an asset of the estate if the petition in bankruptcy is filed after the check was drawn, but before final payment...." The Court has also located two older decision by Judge Pusateri, the author of *In re Figueira*, 163 B.R. at 194, reiterating that the funds are property of the estate, and requiring the respective creditors to repay the money received from the debtor's checking account when the check was honored post-petition. *See Wittman v. Norwest Mortgage (In re Deck)*, Case No. 94-7013, (Bankr. D. Kan. May 11, 1994), and *Wittman v. State Farm Life Ins. Co. (In re Mills),* 167 B.R. 663 (Bankr. D. Kan. 1994), *aff'd* 176 B.R. 924 (D. Kan. 1994) (both adversary proceedings brought under § 549).

[11] *In re Spencer*, Case No. 05-18421, (Bankr. D. Kan. June 27, 2006); *In re Sawyer,* 324 B.R. 115; *In re Dybalski,* 316 B.R. 312 (Bankr. S.D. Ind. 2004); and *In re Maurer* 140 B.R. 744 (D. Minn. 1992).

[12] *In re Taylor* 332 B.R. at 613 (Bankr. W.D. Mo. 2005); *In re Pyatt,* 348 B.R.783 (8th Cir. BAP 2006)*;* and *In re Figueira,* 163 B.R. at 194.

[13] *Nazar v. Lewis (In re Lewis)*, Case No. 05-5531, (Bankr. D. Kan. February 24, 2006) (holding that had the trustee asserted a claim under § 542, "ample authority would have supported entry of judgment against the Debtor," but also noting the Court's reluctance to punish a pro se debtor who had already received her discharge, and who had written 23 checks primarily for small business debts, none of which exceeded $547).

[14] Case No. 05-18421.

4

of bank accounts and their contents to the trustee, not to actually withdraw the funds and deliver them.[15] Judge Nugent instead noted that trustees have several non-exclusive choices:

> They can give and rely upon the Fed. R. Bankr. P. 2015(a)(4) notification to banks if they have sufficient information to do so. They can seek to recover the funds from the payees of the checks by pursuing an avoidance action under § 549. Or, they can seek recovery of the funds from the debtor without an adversary proceeding by invoking either the debtor's duty to surrender under § 521(a) or his duty to turnover under § 542(a). It is ultimately the trustee's duty to collect the property of the estate as expeditiously as is compatible with the best interests of the parties in interest.[16]

This Court agrees with both the rationale and the holding articulated by Judge Nugent and adopts this holding. Here, the Trustee would likely have had no interest in notifying these banks not to honor incoming checks (even if he had the account numbers and the branch locations where the accounts existed, which the parties stipulate he did not) for the recovery of the seemingly inconsequential $125 that Debtors had sworn, under oath, was the total in both accounts.

In addition, the Court disagrees with the Eighth Circuit Court of Appeals Bankruptcy Appellate Panel's holding in *In re Pyatt*[17] that the trustee is in the best position to prevent this situation by immediately notifying the banks, where debtor has any account, of the bankruptcy filing. That holding assumes the trustee receives sufficient information to do so "within days or even hours of the commencement of the case,"[18] and, more importantly, that debtors' schedules

---

[15]*Id.* at 6 (rejecting the holding of *In re Figueira*, 163 B.R. at 194 and *In re Taylor*, 332 B.R. at 613, which hold that money in a bank account is not actually an asset over which the debtor has control, but rather is simply a debt owed to the debtor by the bank).

[16]*Id.* at 7 (internal quotations omitted) (adopting the holding of *In re Sawyer*, 324 B.R. at 115 and *In re Maurer*, 140 B.R. at 744.

[17]348 B.R. at 786.

[18]*Id.* at 787 (concurring opinion). This Court agrees with the concurring opinion's conclusion that the trustee is not in a better position than the debtor to collect the admitted property of the estate, but disagrees with that opinion's ultimate holding that because debtors no longer physically have the same dollars that were in the account on the date of filing, they cannot be required to turn over equivalent funds to the trustee. This Court relies on § 542(a), which allows a trustee to recover the asset or the "value of such property," for its position on this issue. *See also In re Muniz*, 320 B.R.

5

always truthfully indicate the actual amount in the accounts, not the amount shown on the debtor's check register, so that trustees truly know which cases justify such quick action. At least in this District, the first time the panel trustee receives the debtor's full Social Security Number is usually a minimum of four to five days after the bankruptcy filing, when the § 341 notice is received from the Bankruptcy Noticing Center. This would often be too late for any successful notification by a trustee to actually stop the payment of pre-petition checks.

Furthermore, the court in *In re Pyatt* admitted that under its facts, debtor failed to fulfill his obligation to report the actual bank balance and that as a result, the trustee did not have any real opportunity to prevent the outstanding checks from being cashed by the payee. Notwithstanding those facts, that court nevertheless concluded that the trustee was in the better position to prevent the loss of estate assets. That court also stated that "debtors should be encouraged to disclose [the existence of outstanding checks] to their attorneys who, in turn, can communicate that to the trustee in some fashion."[19] But encouraging debtors, and their counsel, to communicate, with no apparent repercussion if they do not, does not bring the estate property back into the estate.

The *Pyatt* decision goes on to say that any "transfers that slip through the cracks could be avoided by the trustee."[20] As Judge Pusateri noted in *In re Figueira*, however, the theory that a

---

at 700 n. 2 (holding the fact a trustee cannot demonstrate a debtor's possession of estate property at the time of turnover action merely means that his remedy becomes a money judgment for the value of the estate property, rather than an order for turnover); *cf. Boyer v. Davis (In re U.S.A. Diversified Products, Inc.),* 193 B.R. 868, 879 (Bankr. N.D. Ind. 1995) (holding that "a turnover defendant's lack of present possession of property of the bankruptcy estate or its proceeds is not a defense to a turnover action under the Bankruptcy Code"). Were that not true, the consistent holding that debtors must repay to the estate the pre-petition portion of any tax refund received, even when the debtor has spent the actual refund monies, would be in doubt. *See In re Barowsky*, 946 F.2d 1516 (10th Cir. 1991) (holding that tax refunds attributable to pre-petition portion of taxable year was property of the estate) and *In re Montgomery*, 224 F.3d 1193 (10th Cir. 2000) (holding that Earned Income Credits are treated just like income, and the pre-petition portion becomes property of the estate).

[19] 348 B.R. at 787.

[20] *Id.*

6

trustee can always recover directly from the creditors who cashed the pre-petition checks under some preference theory is faulty unless the checks both exceed $600, pursuant to § 547(c)(7), and fit all the other criteria required to qualify as a preference.[21]

In actuality, it seems that debtors (especially those represented by knowledgeable bankruptcy counsel) are in the best position to prevent this situation. First, and undoubtedly the most simple solution, is for debtors to wait until all outstanding checks have cleared the bank before filing their petition. Second, if immediate filing is required, because of a pending foreclosure or otherwise, they can stop payment on the outstanding checks. Third, debtors have the option of simply closing the bank accounts. Fourth, debtors can contact their banks and provide a notice of the filing of the bankruptcy petition, creating a duty on the part of the institutions to not pay the checks. It is true that the latter three options could theoretically cause debtors criminal problems on the back end, if someone suggested these steps were taken with the purpose to defraud. As the concurring opinion notes in *In re Pyatt,* however, "there is clearly no purpose to defraud if a bankruptcy debtor stops payment on a check in fulfillment of the debtor's duties under a federal statute."[22]

### III. CONCLUSION

Although courts disagree on the issue of which party will be found ultimately responsible for replenishing the estate when estate property has not been paid to the trustee for distribution, the courts all tend to agree on one thing---that this is a sad result for debtors, most of whom likely write the checks, and erroneously list the account balances, without understanding the law. As the Court in *In re Sawyer* noted,

---

[21]*In re Figueira*, 163 B.R. at 195.

[22]*Id.* at n.13.

> Although this Court has an enormous amount of sympathy for the pro se Debtors in this case who apparently acted in good faith, the Court cannot disregard those provisions of federal and state law which provide, at a minimum, (1) that the Debtors' interest in the ... Account became property of the bankruptcy estate when they filed their petition, and (2) that although the Debtors may not have had technical custody of those funds as to which they had written checks to their creditors, they did have control over the funds, because Wells Fargo had not authorized, as a payor bank, any final payment on the checks that the Debtors had sent out by mail.[23]

This Court shares that sympathy, but is also constrained to follow the law.

Even if the Court allowed sympathy for uninformed debtors to alter its ruling, these Debtors are "likely in a no-win situation," at least as to the payments to their mortgage creditors. The Trustee does have a choice of remedies here, but he has chosen to go against Debtors, presumably because it is more cost-effective.[24] If the Trustee could or did go after these lenders for return of the estate property they erroneously received, and those lenders were forced to return the funds to the Trustee, Debtors would be placed into default under their loan agreements, and they would either have to repay the money or face foreclosure. This is certainly not a favorable result for Debtors, either.

As the Court noted in *In re Dybalski*,[25] this Court does not fault the Trustee for choosing the easier route against Debtors, rather than filing adversary proceedings against the entities who improperly received the estate property. This Court also does not suggest that the Trustee is not entitled to pursue Debtors for this money. Nevertheless, the Code is primarily intended to give debtors a "fresh start" and to equalize distribution among like creditors. Although the Court is

---

[23]*In re Sawyer*, 324 B.R. at 123.

[24]Fed. R. Bankr. P. 7001 specifically permits the trustee to request the turnover of property over which the debtor has possession or control by simple motion, rather than by adversary proceeding.

[25]316 B.R. at 316-17.

8

constrained to rule as it has, it does not believe that either of these goals is necessarily well served here. Debtors, who may not be in a position to turn over the funds, must essentially pay the same "bill" twice, with perhaps only a marginal benefit to the estate, while the creditors who received the funds are able to retain them.

**IT IS, THEREFORE, BY THE COURT ORDERED** that that portion of the Trustee's Motion for Turnover not previously adjudicated is granted, and judgment is entered against Debtors in the amount of $2,797.79. Debtors are ordered to forthwith turn over the sum of $2,797.79 to the Trustee if they have such funds. If they do not have those funds, the Trustee will be required to take normal collection efforts to collect the judgment entered herein.

# # #